Our next two cases, which are consolidated, are Case Numbers 16-10331 and 16-10917. Both style Timothy Juback v. Michaels Stores, Inc. Mr. Aiello. Jack Aiello. I'm here to represent the plaintiff and appellant, Timothy Juback. The question is whether the district court incorrectly took this case away from the jury by granting summary judgment. And the question to be asked and answered is, was there sufficient evidence and permissible inferences in the record from which a reasonable jury could conclude that a substantial reason that the defendant terminated Mr. Juback was his filing a workers' compensation claim. I say substantial reason because it's important to keep in mind that under the law, for a workers' comp retaliation claim to be actionable, it only need to be a substantial reason for the termination. It need not be the only reason. The employer may have had other reasons, but if the employer also considered workers' compensation as one of the bases, that is actionable retaliation. The key facts in this case really set up a very suspicious chronology from which Mr. Juback contends a jury could conclude through the evidence and inferences that Michaels considered and used as a basis for termination the workers' comp claim. Before Mr. Juback was injured in September of 2013, Michaels had some issues they wanted to talk to him about. And they had already decided not to terminate him for those issues. They were going to give him a warning. When the injury happened on September 5th, things changed. Michaels' behavior toward Mr. Juback changed significantly. Well, hadn't it already changed when he got the new boss, John Roberts, who was on him from the beginning, not about shoulders, but about false expense reports and having his own private company, that he thought he was spending too much time on that? Wasn't that boss all over him for reasons that had nothing to do with his earlier shoulder injury? I think it's fair to say that there's evidence in this record from which a jury could find that Mr. Roberts and Mr. Juback perhaps didn't get along as well as Mr. Juback and his previous supervisor, Mr. VanRoekel. And when you say the private... Not getting along. It's a written warning where he actually found that your client had submitted improper expense reports and was told he better not do that again. Yeah, something about some bottled water and a dinner. And that was explained in the record, too. But a warning was given. No indication the new boss, Mr. Roberts, knew anything about this shoulder injury that occurred before he arrived on the scene, correct? Actually, the evidence shows that when Mr. Roberts arrived on the scene, he knew that Mr. Juback had been injured in February about six weeks earlier and had not made a workers' comp claim. That wasn't the same injury from September, but he knew about that. And that plays into some of the things we believe the jury could infer. But you're right about the expense report thing. And a warning was given in June of 2013 about that. No termination. And there's no evidence that anything like that was repeated. So that shouldn't have been part of the consideration, not a reasonable consideration after June. On September 5th, Mr. Juback was injured. On September 6th, with Mr. Roberts' knowledge, he went to a doctor to determine how significant his injury was. He had reported this injury already to his company and that he was going to make a workers' comp claim. So he goes to the doctor and Mr. Roberts, wanting to deliver the warning message, but not a termination notice, a warning message about the other issues that were pending, started contacting him during the day while he was at the doctor. He contacted him by email and insisted that Mr. Juback make himself available for a telephone conversation later in the day. I don't know how many emails there were, but there were several. And Mr. Juback resisted, but Mr. Roberts insisted. So he did get Mr. Juback on the phone at Mr. Juback's home when he was back at the house at 4.30 or 5 o'clock. Mr. Roberts emailed the warning paper to Mr. Juback. And Mr. Juback advised Mr. Roberts that he was on pain medication. He was in a lot of pain. He said, I'm on pain medication. Mr. Roberts persisted in going forward with this conversation, and he was very aggressive in the conversation. Very aggressive. He insisted that Mr. Juback read the warning paper over the phone, told him that you have two minutes to read it. He said, if you don't read it in two minutes, you're fired. And then he did some kind of a countdown and was timing him as he read the paper. There's evidence that at some point during the call, he made a very inconsiderate remark towards Mr. Juback's wife, telling Mr. Juback, tell her to shut up or I'll shut her up. Surely, there's conflicting evidence about what Mr. Roberts said, but that evidence is in the record from which a jury could find that Mr. Roberts was extremely inconsiderate, agitated, maybe angry. Maybe angry. And that's something that a jury ought to know about. Finally, when Mr. Roberts heard again from Mr. Juback that he was on pain medication, he relented and the conversation ended. But right after that conversation, Mr. Roberts engaged in a significant effort to investigate Mr. Juback. And this is what's really interesting and something a jury could deduce Mr. Roberts' motivation from. You say in the brief over a dozen times that this investigation was either unusual or highly unusual. Yes. But under these circumstances, how can you say that? I mean, all of these facts seem to point to where we need to investigate or somebody needs to investigate further. How is it unusual? Okay. And I'll explain that. Mr. Roberts investigated a couple of things, I would say two different categories of things he was investigating. The first one is maybe I can show that this injury is being faked. So he looks for and has somebody pull the surveillance video from the Brandon store where the injury occurred and he's watching those videotapes hoping to see that the injury didn't really happen and nothing significant really happened. Well, that wasn't the case. There was a significant event. He checks Mr. Juback's military history because I think he knew that Mr. Juback had a prior injury from the military to see if maybe this is really the same injury and he's just faking a new injury. And then the second category of things he looked at is perhaps very telling. He looked at videotapes from various stores that Mr. Juback visited as part of his job to see if Mr. Juback had even been doing his job. No one had ever told him otherwise, but he looked at these videotapes. The jury could conclude hoping to hit a home run, hoping to find dirt and a terminable basis that had nothing to do with the workers' comp injury. That's a very suspicious thing to do. That has nothing to do with the injury at all. So why did he do that? Isn't it sort of consistent with that? That's where we're rolling along and here comes the new boss. And the new boss is all over you. And isn't it consistent? Mr. Roberts seems to be a tough taskmaster. He's already kind of not happy with your client to begin with based on the expense report and the private business that he's running and some reports that he's annoying people by trying to sell his product to them. And so looking at other videos to see if he's actually doing his job is not inconsistent. Is it with the fact that his supervisor, Mr. Roberts, already had some issues with your client's job performance? It's one inference that could be drawn, but let me just add one more fact to it. There was an injury in February that Mr. Joubak did not report to workers' comp. I wrote about it in the brief. There was a manager there who said you better not report this to workers' comp. Mr. Joubak took that seriously and did not do so. Michaels has a policy that disincentivizes reporting workers' comp. injuries. It penalizes a store that has a workers' comp. injury. And maybe even more importantly here, one of the factors in the mix of considering manager bonuses is whether there are workers' comp. injuries to employees under their supervision. This would include Mr. Roberts. So that when Mr. Roberts heard that Mr. Joubak had an injury and was making a workers' comp. claim, we don't know, but the jury has the right to know, was Mr. Roberts thinking this is going to hit me right in the wallet. And that might explain why he's immediately doing an investigation that nobody asked him to do to see if he could prove that the injury was fake, because he was personally going to be potentially financially hurt by this. Well, the company policy was that employees are supposed to report any possible workers' comp. immediately, right? That's right. And that makes sense, right? I mean, you can't quarrel with that. Well, in February, when Mr. Joubak had the injury, it didn't report it, and he says because the manager told him you shouldn't. Mr. Roberts was told about that February injury just a few weeks later when he became Mr. Joubak's supervisor in April. Nothing in the record shows that Mr. Roberts ever went to Mr. Joubak and said, you know, I know about that prior injury. You've got to report injuries when they happen. The jury could infer from this record that Mr. Roberts was hostile to workers' comp. claims because it was going to affect his bottom line. Remind me again about the temporal proximity of the termination. Yes. September 5th was the injury. October 4th. September 6th was the discussion between Mr. Roberts and Mr. Joubak, and the termination is October 4th? October 4th, less than four weeks later, less than about four weeks later. And what's interesting is the last two weeks of that period were completely silent. Mr. Joubak was back at work, but observing his doctor's restrictions, there's nothing in the record to show that anything else happened to justify termination. I thought that, and when all of that happened, I'm looking at my notes, that he's gotten information from HR about the problems with Azizia, but he also, that people being hassled a little or solicited, but that we had this vendor come through, and the vendor comes through and says, your client's been talking to me about his private business.  I think it's a problem. Didn't that happen during this period of time? On September 13th, I think it was his first day back on the job, he had a lunch with a guy named Matt Robbins from GIS, and we talk about that in the brief too, yeah. Michaels lists that as one of the reasons that they terminated him. It's a company that was incorporated just in August, the middle of August. It never did any business at all. Michaels writes in their brief, he opened a new business. He never opened a business. That's the first person he talked to about the possibility of doing background checks. With a client that's already got two strikes, arguably this is a third strike, not shoulder related, but a third problem for him, correct? Well, Mr. Roberts says, he didn't tell us about this, and this concerns us. Well, he hadn't done any business. We don't know if he would, Mr. Roberts found out about this by going on Google search. We don't know if Mr. Joubak, when he got back to work, was going to say, by the way, I've incorporated a company, I'm thinking about doing some loss prevention consultations on the side. Does that bother you? He didn't get a chance to do that. And by the way, that wouldn't have been competitive with Michaels at all, as we talk about in the brief. Michaels doesn't do loss prevention services. What was the vendor's nature of business? Background checks. So, that would have been something maybe that Joubak would want to offer, he wanted to know about that. He testified, I never asked this company to do background checks for me, but even if he had, that wouldn't have been a conflict. And that company was doing business, the vendor was doing business with Michaels or was not? Yes. They did background checks for potential employees for Michaels. I know I'm taking a little of your time, but one question, Drago is our big case in this circuit that says, look, all you've got really is temporal proximity, that he has the shoulder injury and not too long after they fire him, so an inference can be drawn. Our Drago case says temporal proximity is not going to be enough to get you over the line if you have evidence that shows the employer already was, that your employee was already in kind of deep trouble and the employer is already giving thought to termination for other reasons. How do you handle or rebut Drago in this situation? Because it's absolutely clear and undisputed that as of September 5th, Michaels had decided not to terminate him. They were just going to talk to him about the issues that were outstanding. I thought it was giving him final warnings. Final warnings sound like you could be in deeper trouble if you don't adhere to them. Final warning doesn't sound like good news to me. It doesn't to me either, but I didn't see anything in this record that showed there's something other than a final warning. I think in June, it was a final warning too. First warning is a final warning, so there was never a preliminary warning to the expense thing, never a previous warning to the conversation about ZJ. They already knew about this ZJ energy drink thing, whatever it was, before. You said Drago is factually distinct. It's distinct, yes, it is. Okay, Ms. Riello, we'll give you your full time for rebuttal. Thank you. Thank you. Mr. McRae. Yes, may it please the Court, Richard McRae. I'm here on behalf of the appellee, Michael Storz, Inc. Let me just say that the undisputed record evidence shows that Mr. Joubak was on thin ice at the time of his termination, even before he had reported a workers' compensation injury. Mr. Roberts had already twice recommended that Mr. Joubak be terminated, and Mr. Joubak had been given two final warnings. Significantly, Mr. Joubak had been given a final warning for the same performance issues that ultimately formed the basis for his termination. On Friday, August 30, Mr. Roberts called Mr. Joubak while he was on vacation and informed him, probably a judgment error, but informed him that when he returned from vacation, he would either be terminated or he would be issued another final warning. And on his first day back, before Mr. Roberts had a chance to communicate to Mr. Joubak whether he was going to be terminated or receive a second final warning, Mr. Joubak reported a workers' compensation injury that was unobserved. After Mr. Joubak reported the workers' compensation injury, Michaels received additional information. And after Mr. Joubak had been given a second warning, Michaels received additional information. First, it received the report from its vendor, Mr. Robbins. Mr. Robbins reported to Michaels that Mr. Joubak told him that he was starting his own consulting business and he wanted Mr. Robbins to help him with background checks. Mr. Robbins testified that the conversation made him feel, quote-unquote, uncomfortable, and he felt that it was a, quote-unquote, conflict of interest. It's noteworthy that this lunch between Mr. Robbins and Mr. Joubak took place just a week after Mr. Joubak was formally warned that the company was concerned about his lack of commitment to his job. There, Mr. McCrea, there's certainly evidence that shows, I think, that Michaels' decision was not pretextual. But the question is whether or not there's also other evidence that might show that it is pretextual. With regards to the ZJ venture, isn't there evidence that Mr. Roberts himself asked Mr. Joubak for a ZJ sample through an email during business hours? That is correct, Your Honor. That guy who's firing him for doing outside consulting stuff and he's asking him for samples of the product he's, you know, selling on the side? Yes, but the record shows, Your Honor, that that was fairly early on in Mr. Roberts' tenure. That was before HR had reported. That doesn't matter. It may matter at the end of the day, but you're talking about a supervisor who was supposed to be a stickler for the rules about outside work interfering with, you know, Michaels' mission, and here he is, when it suits him, getting some ZJ samples by email during business hours. Well, that doesn't paint a pretty picture. I would respectfully submit, Your Honor, that it's qualitatively different because of the... Oh, it might be, and a jury might well say, yes, you're right. That was well before and things changed and that's not pretextual. But we're not supposed to be substituting our views for that of a jury. And on everything you say, there's at least a relatively plausible counter-argument. So for example, Mr. Joubak testified that he didn't ask the vendor to do any background work and didn't ask him for any business, just asked him about general things having to do with conducting background checks. There was evidence that his other business was inactive. So you know, there's a lot of other stuff. There's the temporal proximity, which doesn't get you over the line. Everybody understands that. But it is a factor. You know, it's Mr. Roberts calling Mr. Joubak the day after the injury and essentially berating him over the phone, at least a jury could so find, with regards to his warning, although he just came back from a doctor. So you know, the smoke may not be enough, but this is not a pretty picture for Michaels either. But Your Honor, again, I think the record is even admitted by Mr. Joubak that what Mr. Roberts was upset about was that Mr. Joubak was arguing with him over the content of the final warning, the second final warning that he was receiving. And with, again, with respect to the fact that Mr. Roberts said at one point, it wasn't just a content, it was the whole nature of the conversation. If you accept Mr. Joubak's version of it, it wasn't just Mr. Joubak saying, oh, I disagree with the content. That's not correct. I didn't do that. You know, you're not doing the right thing by me and all of that. It's the nature of the conversation. Well, there's no question that there was antagonism and even heat in the conversation. But Mr. Joubak doesn't testify that Mr. Roberts said it had anything to do with his injury. Of course he wouldn't. But Mr. Joubak admits that his view was- That's why the circumstantial evidence case. Okay. Now we wouldn't be here. Right? If Mr. Joubak had said, listen, this all protects you. I'm just trying to paper everything up so that nobody knows that I'm really discriminating against you because of your worker's comp claim, you would not have survived. You would have gone to a jury. Right? But we're here because it's a circumstantial evidence case and the question is whether or not there's enough to create an issue for a jury on pretext. I just want you to address the non-favorable parts of the record for me. Okay. Well, let me address it in two parts. One is that there are two alternative basis that this court can affirm the district court summary judgment. The first is the causal connection and this case is on all fours with Drago. There's no question that prior to any worker's compensation injury, first of all, there's no question that as the trial court noted, Mr. Joubak relied exclusively on temporal proximity to make that showing. And Drago says that where an employer contemplates taking action, even if it doesn't take it until after protected activity, that temporal proximity is not sufficient to make that showing. In Drago, a demotion recommendation had been twice made. Here Mr. Roberts had twice recommended termination. Instead, in both cases, the employer issued a written warning. And then after the protected activity, the adverse employment decision was made. So in fact, this case is even stronger than Drago because this is a case where the plaintiff, Mr. Joubak, was actually informed before the protected activity that Michaels was contemplating his termination. So this court can affirm the summary judgment ruling on the basis that following Drago that Mr. Joubak failed to do significantly probative evidence on his essential element of a causal connection. The other issue is pretext, as Your Honor asked me about. And three different arguments were raised before the district court on pretext. One, that the reasons for the termination were not credible. Two, that similarly situated employees were treated differently. And three, that Mr. Roberts had a retaliatory animus toward him. And the district court rejected all three arguments. And the law is clear that Mr. Joubak cannot establish pretext merely by quarreling with the correctness or wisdom of Michael's decision. Here the reasons are credible because one of the new pieces of information came from a third party, a vendor. Now it's not significant whether the vendor was correct about what was discussed during lunch or what Mr. Joubak says what was discussed, but what was reported to Michaels and what Michaels relied upon in making its decision. And Mr. Robbins testified that he did make this report, that at page 56 he said he thought, quote, might be doing something a little shady. And Robbins' reaction and report to Michaels supports the legitimacy of Michaels' concerns about this. The other part that's important is that Mr. Joubak had already been placed on final warning for similar performance issues. And this really gets to the reasoning underlying the Drago decision. The fact that Mr. Joubak was close to termination for similar performance issues before he reported an injury effectively negates any inference of pretext. It's proof perfect of the sincerity of Michaels' concerns about those performance issues. It would be an entirely different set of circumstances if Michaels had just overlooked these things and had never written them up. But even after Mr. Roberts inquired about a sample, he issued a final written warning castigating counseling Mr. Joubak for spending company time and distracting other employees by soliciting them to join his ZJ pyramid. It's not a case where these facts were known before the injury and suddenly were seized upon afterwards. Mr. McCready, let me ask you about a different subject if you're close to wrapping that one up. Moore's opinion at page 17, he makes a statement and I'm going to read it. Joubak must demonstrate that Michaels did not truly rely on the proffered non-discriminatory reasons, citing the Damon v. Fleming supermarkets case. And that was raised as an error in the blue brief at page 26, although it misquotes the statement. It just says it did not rely, did not say did not truly rely, but it's close. But you have not responded to that in your brief at all. And that seems to be a pretty broad statement that I'm not sure it comports with what the law is. Let me give you a chance to respond because you haven't in your brief. Well, Your Honor, I note that in at least two different places, the appellant And it cites, excuse me, but it cites the Florida second DCA Hornfisher case. Yes, sir. And I appreciate that because at two or three different places, the appellant cites to the fourth DCA decision in Hubbard and the Hornfisher case. And the summary judgment standard, as we know, is procedural, not subsidive. And the Florida Supreme Court has rejected the Celotex standard. And there is a more restrictive, more limited summary judgment standard under the Florida summary judgment rule. And that is as cited in those cases, if there's even the possibility of an issue of fact or the slightest doubt that an issue of fact might exist. That's not the Rule 56 standard under Celotex. Summary judgment is mandated if a party that bears the burden of proof on an essential element fails to adduce significantly probative evidence supporting that element. That Florida Supreme Court case is cited in your brief. No, ma'am, I apologize. I was responding to the question, but we did not. What is, don't leave us in suspense, what is that Florida Supreme Court case? I don't have it committed to memory, but I know that the summary judgment standard, as cited in the cases, the Florida cases, follow the Florida law on the summary judgment standard, which is distinct than the Rule 56 standard. And for that reason, and I apologize for not having that. You're saying that that is a procedural rule in Florida for all summary judgments across the board and not a substantive requirement for workers' comp retaliation cases. Exactly. Well, let me disagree. I think the trial court really relied on the Damon case, which correctly sets out the law. And he quotes it, an employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct. In other words, you may be mistaken, but if it's a reason that was provided to you, you're entitled to at least act on it. That's what the law is. But that's not what Judge Whittemore said in his statement here. And that's why there's a conflict between those two. Okay. And I hadn't picked up on that, Your Honor. I do agree with the Nix line of cases that the employer could be wrong. It could be wrong on the facts. It could be incorrect even in its judgment, as long as it's not relying upon unlawful or protected reasons. Judge Whittemore says Jubeck must demonstrate that Michaels did not truly rely on the proffered nondiscriminatory reason. In other words, Jubeck must demonstrate that. That's a different twist to it. Well, I think I read that as a statement that under Solitex, he bears the burden of producing significantly prohibitive evidence to establish pretext. But he doesn't have to establish pretext. He has to present enough evidence to get to a jury on pretext. I agree. And I was sort of in the middle of my pretext argument. But if I could go back, I can answer questions. Well, the second argument on pretext was similarly situated. This Court has said repeatedly, you have to be similarly situated in all relevant respects so the courts are not comparing apples and oranges. None of the other employees were similarly situated to Mr. Jubeck. They didn't report to Mr. Roberts. They were not in the same position. There was no evidence that they were selling to co-workers. There was no evidence that they were selling during company time. There was no evidence that Michael's had a concern about their commitment to their job or their use of their time. But this is not a disparate treatment case like normal disparate treatment cases, right? On the workers' comp issue, it's a retaliation case. I agree. And in that, my understanding of the applicable law is you don't need to show a comparator the way you might need to show a comparator in a traditional workplace discrimination case based on gender, race, ethnicity, religion, or the like. I don't think you have to, Your Honor. But I think in a retaliation case, the fact that someone who's similarly situated is treated differently would support an inference of pretext. And it was argued here. Yeah, I don't disagree with that. I think you're right about that, that it may be important. I'm just not sure that it's necessary. Okay. In other words, if you have the right set of facts, you may not need a comparator in a workers' comp retaliation case. I agree. Right. And finally, I agree that the characterization that this investigation was sudden and unusual is not the record, not supported by the record. Mr. Roberts began investigating Mr. Jubak shortly after he became his supervisor. In fact, only a month after becoming a supervisor, he asked for 12 months of his expense reports. And Mr. Roberts testified that it was, and this is page 212 of his deposition, that they always look for videotape if there's an injury reported. You know, I know we've asked you some questions, but you're a minute into your red light. If you want to wrap up, you can go right ahead. I would ask the court, either on the basis of Drago and the failure to establish the causal link or on the failure to establish significantly probative evidence of pretext to affirm the district court's ruling on the retaliation claims. I'll rest on the briefs on the other issues. All right. Thank you very much. Mr. Ayala. Thank you. I'm going to try to respond to some of the issues that were, of course, just discussed. Starting with the issue raised by Judge Vincent about the trial court statement that the obligation was on Mr. Joubak to demonstrate that Michaels did not truly rely on the proffered non-discriminatory reasons. Well, he does have a burden in that regard, right? With regards to pretext. Yeah, he has to come forward under the McDonnell-Douglas stand. That's correct. He does have a burden to come forward with evidence or inferences that the jury could rely upon to defeat pretext. But so saying that the whole burden is on Joubak is wrong. But the other problem with that line of reasoning by the court is that it overlooks what I said at the outset, that the workers' comp retaliation only needs to be a substantial reason, one reason for termination. The court could properly rely on, I'm sorry, the defendant might be relying on other grounds that are appropriate grounds. But what it may not do is partially rely on the improper ground of workers' comp retaliation. And the court seemed to have overlooked that and really decided this case on the wrong standard. Just did not seem to get that and how that. And the origin of what you just said that it only has to be a substantial reason is what? There's a couple of cases. The Hubbard case. It's a Florida statute. And yes, it's interpreted by Florida cases. That's correct. It may be that the Posada case from this court touches on it, but I don't want to commit to that. We cited that case. I don't know. It's also based on Florida workers' comp. What's the Supreme Court, Florida Supreme Court, Supreme Court of Florida case that you're relying on for that substantial reason? Is there one? No, there isn't one. Is it the Hornfisher case? The second DCA? Hornfisher and Hubbard. Hubbard is fourth DCA. Hornfisher is second DCA. So those are the two in my brief that we rely upon. All right. The second issue I'll address is, and I think Your Honor touched on it. This is not a disparate treatment case. So that while Michael says that we're asserting similarly situated employees being treated differently, that's not true. The provativeness of the evidence that other employees were involved in businesses that competed with Michael's and Michael's allowed it is really just to allow the jury, it could Michael's tolerated that, then we got a question whether Michael's really cared deeply about what Mr. Joubak was doing here. It supports pretext. Concept of pretext is that the employer is misrepresenting, lying about why they terminated the employee. As the Hornfisher case points out, and we put the quote in our brief, we can't expect the employer to just announce that he's terminating an employee for an improper purpose. All right. It's easy for an employer to make up performance-based reasons. We have to look at the whole record and apply our common sense. That's the test, though, and I'm reading from Hornfisher. And it says, a trial court should evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find them unworthy of credence. That's the end of the Hornfisher quote. And that is the burden that we just discussed. But it says you look at the whole picture. You look at everything, right? Absolutely. But only the jury can do that. Our complaint here is... No, it doesn't say that. It says the trial court should evaluate. Well, on summary judgment, the trial court should evaluate whether the plaintiff has offered enough evidence and inferences that a jury can permissibly draw that would defeat pretext. But the ultimate determination and consideration of the facts on both sides, and most importantly in a case like pretext, who's telling the truth and who's not, has to be submitted to a fact finder where the plaintiff has come forward with plausible facts and inferences, plausible evidence and inferences from which an inference can be drawn that Michael's had other reasons besides those that they're stating. That's our complaint here. Are we here on federal question jurisdiction because of the FMLA claim? Are we here as to this Florida workers' comp claim? Is that diversity jurisdiction? I believe it's a federal question. I believe that's right. But for that, you would have been in Florida courts all along. Right. And in fact, there were a couple of expense claims where Michael's did not reimburse JUBAC for expenses. And those claims then were dismissed to be determined under Florida law. But the judge, when he dismissed the FMLA claims, could, I guess, have taken this Florida workers' comp claim and sent it back as well. But he went ahead and wrote on it. I suppose that's right. They're all so bound together in terms of similar issues, except the one big difference is that under the workers' comp claim, it need only be a substantial basis for determination, not the entire basis. I want to go back to Roberts and the jury being able to deduce or to infer from the telephone conversation on September 6th that Roberts was agitated and very angry. The question that jurors might wonder and should be permitted to wonder is why couldn't that conversation wait? Why couldn't that wait a day or two? It really shows a very angry Roberts. And when we couple that with how this may have impacted his wallet directly, the jury could infer that Roberts was very angry about the workers' comp claim. And he was the main protagonist in the termination decision. He's the one that pushed for it. This record shows that. Your Honor mentioned that Mr. Roberts asked for a seizure sample himself by sending an email to Mr. JUBAC, interestingly, during working hours. Well, it's also true that Mr. Roberts did not share that fact with the other decision makers at Michaels with regard to the termination process. And I agree that he's a little bit dirty in that respect. It doesn't look great for Michaels. It looks sort of two-faced in a sense. Well, Roberts also said something else the jury could wonder about. He said, I didn't really like the seizure projects. I didn't think they did anything for me. We could all wonder, if he'd liked them, if this would all have come out differently. But that shouldn't be a determining factor about whether an employee is terminated or not. And finally, calling the investigation not a new investigation isn't fair on these facts. Mr. Roberts was investigating facts he discovered on September 5th. He was investigating the injury and the things he did in this new investigation related to something that had just happened. Referring back to an investigation he did about expenses six months earlier, that's not part of this investigation. He launched a new investigation because he was very upset, the jury could find, about this injury. All right.  Thank you, Your Honor.